MICHAEL NICHOLSON, Appellant, v. ACME CEMENT PLASTER COMPANY, Respondent.

St. Louis Court of Appeals, November 16, 1909.

1. CONTRACTS: Consideration: Mutual Promises. Plaintiff, a subcontractor, contracted to plaster the interior of a schoolhouse, agreeing to do a first-class job and to guarantee the plastering upon the ceiling would remain in place two years. The plaster, which was manufactured by defendant, was put upon the ceiling in a workman-like manner, but, shortly after being put on, it began to blister and fall off. Walker, one of defendant's officers, was called in to examine the work, and he told plaintiff to replaster the ceilings at once, and send the bill to him, and he would pay it. Nothing was said about what materials should be used in replastering, and the same kind was used. *Held*, it is a fair inference that plaintiff assented to Walker's proposal for him to replaster at Walker's expense, and if this be true, there were mutual promises which would constitute a contract binding on plaintiff and Walker, or defendant, whom the latter represented.

2. ———: ———: Unilateral Contracts: Performance. Though the contract was unilateral in the first instance, it became binding on defendant when plaintiff did the work and incurred expenses under it.

3. ———: ———: Restricting Original Obligation. Plaintiff's original contract did not require him to use defendant's cement in replastering, but likely he and Walker understood the replastering was to be done with that cement, and if this were true his obligation was more restricted and onerous than the original contract, and this would furnish a consideration.

4. ———: ———: Commercial Advantage. While, from a commercial point of view, defendant had a strong motive to get the work done over without the faults of the plastering becoming generally known, as would happen if there was a prolonged

dispute or litigation, it' cannot be said this motive amounted to a consideration, for the financial benefit defendant would receive from having the subject dropped would be indirect and not accrue from the agreement.

5. ———: ———: **Detriment to Promisee.** Though plaintiff under his original contract was bound to replaster, and though he was not bound by his agreement with Walker to use defendant's cement, Walker's conduct in cutting off further investigation as to where the responsibility lay for the failure of the plaster to adhere, and directing plaintiff to replaster at once, at least caused plaintiff to waive a further examination into his obliga- tion and responsibility and further deliberation upon whether he would replaster with defendant's cement or some other, and hence was a detriment to plaintiff and as such constituted a valid consideration for the contract.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale;* Judge.

REVERSED AND REMANDED.

*Daniel Dillon* and *Paul Dillon* for appellant.

(1) By pamphlets and books, circulated among plasterers and dealers and the public, defendant represented this plaster as having great adhesive qualities and as being superior to other plasters, and guaranteed every sack of it in every particular. These representations and this guarantee were made and intended to be made to every person using this plaster for plastering purposes, and they bind defendant in favor of the person using the cement, the same as if the representation and guarantee were made to him direct. Blood Balm Co. v. Cooper, 83 Ga. 457; Watson v. Brewing Co., 124 Ga. 121; Woodward v. Miller, 119 Ga. 618; Schuber v. R. J. Clark Co., 49 Minn. 331; Tomlinson v. Armour & Co., 75 N. J. Law 748; Cunningham v. House Fur. Co., 74 N. H. 435; Benjamin on Sales (5 Ed.), p. 450. Even if defendant is not liable on account of its guar- antee and representations, it was liable because of neg- ligence in putting up plaster to be used for plastering

purposes of so poor a quality and so lacking in cohesive quality that it would not adhere to the surfaces to which applied, and in putting it in the same kind of sacks and marking them in the same manner as sacks containing plaster of good quality, having good adhesive qualities. Cunningham v. Pease House F. Co., 74 N. H. 435; Tomlinson v. Armour & Co., 75 N. J. (Law) 748. Of course, if defendant was, in any view of the evidence, liable for the loss occasioned by the plastering becoming loose then it necessarily follows that it is liable under its agreement with plaintiff by which it requested him to do the necessary replastering and promised to pay him the expense thereof. The most that defendant could claim was to have the case submitted to the jury under proper instructions. Lamp Co. v. Mfg. Co., 64 Mo. App. 115. (2) The agreement between plaintiff and defendant by which plaintiff was to repair the defective plasterings at once and defendant was to pay him the expense incurred in doing it, was a compromise and settlement of a controverted question as to who was responsible for or should bear the loss of the replastering, which had to be done by somebody. Livingston v. Dugan, 20 Mo. 102; Marshall and M. v. Larkin and Sons, 82 Mo. App. 641; 6 Am. and Eng. Ency. of Law (2 Ed.), p. 711, and cases cited in note. (3) Defendant contends that there was no consideration for its promise because plaintiff was, under his contract with Gerhard, bound to replace the defective plastering. Defendant was no party to the contract between plaintiff and Gerhard and it could not maintain an action based on it against plaintiff or anyone else. It was not made with defendant or for benefit of defendant. Howsman v. Water Co., 119 Mo. 309; St. Louis v. Von Phul, 133 Mo. 565; Deavers v. Howard, 144 Mo. 677; School District v. Livers, 147 Mo. 583; Insurance Co. v. Water Co., 42 Mo. App. 122; Carpenter v. Realty Co., 103 Mo. App. 502; 9 Cyc. of Law and Proc., p. 353 and cases cited in note 75; Abbott v. Doane, 163 Mass. 433;

Humes v. Decatur L. Imp. and F. Co., 98 Ala. 437; 12 Harvard Law Review, 515, especially pp. 519 and 520.

*W. E. Fisse* for respondent.


E. C. Gerhard contracted with the board of education of the city of St. Louis to erect the Webster school building. He sublet the contract for the plastering to plaintiff, subject to the conditions of the main contract between Gerhard and the board of education. One of those conditions was that the contractor would guarantee for two years the plastering on the ceilings should remain in place. Every sub-contractor bidding on a portion of the work was bound to read the specifications in the contract of the main contractor, and it was provided that persons who proposed for sub-contracts agreed to carry out the terms of the drawings and specifications. The main contract, which became binding on plaintiff when his bid for the plastering was accepted, required as follows:

"To be plastered throughout as above specified, with one of the following cement plasters:

"Acme, Royal, O. K., Peerless, Agatite, Fire Pulp, or Fitzgerald's Peoria Cement Plaster. Plastering to be done in strict accordance with the manufacturer's directions for a first-class job.

"Plaster the ceilings throughout with as thin a coat of plaster as possible to make a straight job, using neat Acme wainscot finish; the same to be mixed with clean water to the proper consistency for use.

"In case concrete lintels are used, this contractor shall include the plastering of all lintels, etc., in the basement.

*"Guarantee.*

"The contractor for plastering will be required to guarantee that the plastering upon the ceilings will remain in place—said guarantee to be for a period of

two years dating from the issue of the final certificate to the general contractor.

"All of the above work to be a strictly first-class job to the satisfaction of the commissioner."

Plaintiff bought Acme cement plaster to use in the building. This plaster appears to have stood well on the walls, but much of that put on the ceilings cracked, blistered and fell off; so that the work of plastering the ceilings was not satisfactory to the building commissioner, and it became incumbent on Gerhard, as general contractor, to make it good and in turn Nicholson was responsible on his guaranty for two years. The Acme Cement Company had published pamphlets in which it advertised its plaster as possessing strong adhesive qualities, and adhering firmly to brick, stone, terra cotta and wood; also describing the plaster and expatiating on its qualities and superiority over other plasters, saying it was guaranteed in every particular as far as the nature of the material was concerned, but had to be put on in a certain way to secure the best results and setting out the mode in which it should be spread; saying further it always proved satisfactory to architects, owners and plasterers when properly used. We are not much concerned with those matters and suffice to say about them the evidence goes to show the plaster was laid on the ceilings of the building in question in a workmanlike manner. After it began to blister, crack and fall off, there was a parley between the general contractor Gerhard, the superintendent of the construction of the building and plaintiff, as to the cause of the faults in the plaster on the ceilings. They called in a Mr. Walker who appears to have been the responsible officer of the defendant company. He examined the work, as did also a Mr. Dugan, who was connected with the company, and Mr. Toensfeldt, the structural engineer for the board of education. The board was insisting Gerhard, the general contractor, repair the ceilings at once and go on with the work so

the building would be ready for the opening of school in January and Gerhard was insisting Nicholson make the repairs forthwith. The upshot of the matter was that Walker, representing defendant company, told plaintiff to replaster the ceilings at once, send him the bill and he would pay it. This, in substance, is what the evidence tends to prove. The plaster had adhered to concrete well in other instances when plaintiff used it, and it is not made clear why it was a failure in this one, the evidence on the point being inconsistent. There was some that Walker said the plaster was too rich; other testimony that he said it never would adhere to concrete, and other evidence that he said he would have some of it examined to see what was wrong with it. There was abundant evidence to prove the plaster was bad and had not adhered, though it was spread on properly; as there was also to prove Walker told Nicholson to replaster the ceilings and he would not lose a cent; or as some of the witnesses said, send him the bill and he would pay it. When the interview occurred among the different persons interested, including Walker, there had been no official action by the board of education through the building commissioner, rejecting the work, but the parties were merely investigating and debating the cause of the plaster falling off and called Walker in to get his opinion. Gerhard said he was bound to have a first-class job done on the ceilings and looked to Nicholson, and Nicholson said he would have had to replaster to make the job according to specifications even if Walker had not directed him to do so and agreed to bear the expense. Nothing was said in so many words about what material should be used in replastering, but Acme cement was used. In the conversations antecedent to Walker's agreement with Nicholson to bear the expense, the latter, according to Gerhard's testimony, felt like he ought not to stand any loss because of the condition of the ceilings. He was thinking about going on to Johannes, the dealer

from whom he had bought the cement, but had not done so as yet. In fact, when Walker agreed with Nicholson, nothing had been determined definitely about the latter's responsibility, or whether the material was at fault, and if so, in what respect, whether it would be wise to use it again, or who was liable. These matters were all undetermined, and the parties were attempting to settle them when their effort was cut short by Walker's agreement with Nicholson. Nicholson had to replaster a second time, for the coat put on under his agreement with Walker fell off; but he seeks no recovery for the second replastering. The cost of the work done under the agreement with Walker was about nine hundred dollars, including repainting, material and wages to plasterers and common laborers. When the bill was presented to Walker he declined to pay it, saying he expected a bill of from fifty to one hundred dollars, and if a reasonable one had been presented he would have paid it.

At the conclusion of the testimony the court instructed the jury to return a verdict for defendant and judgment having been entered accordingly, this appeal was taken.

GOODE, J. (after stating the facts).—Plaintiff was defeated on the theory there was no consideration for Walker's promise to pay the cost of replastering the ceilings, because plaintiff was under a contract with Gerhard to do so if the plaster first put on crumbled, and hence in agreeing with Walker and performing under the agreement, he neither undertook to do nor did more than was within the scope of his obligation to Gerhard. It is important at the outset to determine what this obligation was. We hold it was to do "a strictly first-class job to the satisfaction of the commissioner," and guarantee the plastering upon the ceilings would remain in place two years. The job as first

done was concededly a failure and to perform his contract it was incumbent on plaintiff to do it over so as to make it first-class. His obligation was not limited to his guaranty in the sense that he had an option to respond in damages on his guaranty or make the job first-class. It is true he might have refused to replaster, and perhaps as the contract was for personal services, he could not have been forced to do so, and Gerhard's only remedy against him would have been in damages. But if these things are true, it does not follow plaintiff would have performed his obligation by paying damages, though he might have discharged his legal liability. We are no friends to the doctrine which finds a consideration for a promise to pay additional compensation for the performance of a contract, on the theory that the party to the contract was only bound to perform or pay damages at his option, and, therefore, the promise of further compensation to induce him to perform is good, because it secures to the promisee the service he wants instead of leaving him to his remedy in damages. As to this phase of the subject we agree with the views expressed in Harriman, Contracts (2 Ed.), sections 117 to 125 inclusive and 8 Harvard Law Rev., pp. 27 to 30. But neither are we friendly to highly strained technical rules in regard to the consideration of contracts, whereby agreements which parties understood to be complete and valid contracts are annulled. In this matter, more than others, it is important to keep the law in accord with the understanding of the people; and it is our opinion that hardly any man, except an astute lawyer, if placed as plaintiff was, would doubt he had a good contract with Walker to pay the cost of replastering. It is a fair inference from the circumstances in proof that plaintiff assented to Walker's proposal for him to replaster at Walker's expense. If this was true, there were mutual promises which, according to reason and some authority, would constitute a contract binding on both plaintiff and

Walker, or defendant, whom the latter represented. [Langdell in 19 Harv. Law Rev. 496; Harriman, Contracts, sec. 94.] Whether plaintiff accepted the proposal in words or not, he accepted by conduct to Walker's knowledge and replastered forthwith pursuant to the arrangement. If the agreement was unilateral in the first instance, according to the general doctrine it became binding on defendant when plaintiff had done the work and incurred expense under it. [Underwood Typewriter Co. v. Century Bldg. Co., 119 S. W. 400.] When those two propositions of law are to be applied to a case where the new contract deals with the same subject-matter as a previous contract between one of the parties and another person, the courts of the United States for the most part do not treat the new mutual promises, or even performance under them, as sufficient consideration for the agreement, if the performing party already was under an obligation to do the identical thing. In such instances it is conceived there is no detriment to him from the new agreement, and whatever benefit, if any, accrues to the other party to said agreement is held not an adequate consideration. Plaintiff's original contract did not bind him to use Acme cement in replastering, but he could choose among several kinds. The witnesses testified nothing was said about what material he should repair with; but likely he and Walker understood the replastering was to be done with Acme. If this were true, plaintiff's obligation was more restricted and onerous than the one he was under with Gerhard and there could be no doubt that it was supported by a consideration. [Corrigan v. Detsch, 61 Mo. 290.] As the right to deduce this inference from the evidence is somewhat dubious, we will assume Walker's proposal meant plaintiff might use any of the cements mentioned in the specifications. Considered in this aspect the case strikes us, after much search among the books, as one of first impression in respect of the pos-

ture of affairs when Walker's promise was given. There are numerous decisions by the courts of this country that a promise given to a stranger by one party to a contract to do what he was already bound to do, is no consideration for an agreement by the stranger to pay for the performance. [1 Parsons, Contracts (9 Ed.), p. 478, and note; Harriman, Contracts (2 Ed.), sec. 122; Walds-Pollock, Contracts (3 Ed.), p. 209, note 19.] The rule is the other way in England and in a few cases in this country. [Abbott v. Doane, 163 Mass. 433; 34 L. R. A. 1 and annotations.] An examination of the cases in which this proposition has been decided, shows the underlying policy of the rule is to prevent persons from extorting compensation beyond what was agreed upon at first, for complying with their contracts or discharging a duty imposed by law. The spirit of the rule is found in the maxim that a man will not be suffered to take advantage of his own wrong, and properly applied it is a wholesome rule. If allowed to control the decision of a case like the one before us, the reason and policy of it are forgotten, and its application becomes not only arbitrary, but unjust and mischievous. Considered from a commercial point of view, defendant had a strong motive to get the work done over without the faults of the plastering becoming generally known, as would happen if there was a prolonged dispute or litigation. It cannot be said this motive amounted to a consideration, for the financial benefit defendant would obtain from having the subject dropped, would be indirect and not accrue from its agreement with plaintiff, to whom it was not liable for defects in the plaster. But let us look closely at the situation when the agreement was made, and the effect of it on plaintiff's conduct. It had not yet been settled what caused the plastering to drop, or whether the circumstances were such as to constitute a breach of plaintiff's contract. The question of where the fault was and where the responsibility rested were under discussion. Conceding

the conclusion would have been reached that plaintiff was bound to replaster, it would then have been for him to decide whether he would use Acme or some other plaster in the work. Now granting the arrangement with Walker did not bind plaintiff to use Acme, Walker's conduct in cutting off further investigation of said matters and directing plaintiff to replaster at once, at least caused plaintiff to waive a further examination into his obligation and responsibility and further deliberation upon whether he would replaster with Acme cement or some other. On deliberation plaintiff might have decided to use a different plaster instead of making a second experiment with a kind that had failed, and in point of fact his re-use of Acme appears to have entailed on him the task of replastering a second time at his own loss. But the essential fact is that while plaintiff's obligation was under examination and in controversy, the matter was brought to a close by the agreement between plaintiff and defendant. The case resembles Good Fellows v. Campbell, 17 R. I. 402, where it appeared a sister who had been named as beneficiary of a certificate of insurance, while ignorant of the fact, agreed the insurance money might be distributed among all her brother's heirs, including herself. She was held bound by the agreement for this reason, among others: That who was entitled to the fund was uncertain when the agreement was made, and the parties agreed in consideration of mutual chances. [See l. c. 405 and cases cited; also Harriman, Contracts, sec. 109.] The situation with which we are dealing is not that of a party attempting to extort additional pay for doing something he had bound himself to do, for plaintiff was not attempting to evade his obligation, but to ascertain it and settle on how to perform it. We think there was a detriment to plaintiff in agreeing with Walker and performing the agreement, and if there was, the arrangement became a contract supported by a valid consideration. [Strode v. Transit Co., 197 Mo. l. c.

622; Underwood Typewriter Co. v. Century Bldg. Co., supra.] We say nothing about whether the repairing was done for reasonable prices, as that is a matter for the triers of the fact.

The judgment is reversed and the cause remanded. All concur.